UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

CHARLES BAKER, et al.,          )
                                )
        Plaintiffs,             )
                                )
v.                              )      CASE NO. 3:19-cv-00572-RAH
                                )                   WO
RABREN GENERAL                  )
CONTACTORS,                     )
INC., et al.,                   )
                                )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

## I.    Introduction

This is a construction contract and performance dispute made complex by the lack of contractual formality by two sophisticated parties at the outset of their latest—but not their first—relationship.

Presently before the Court is the Motion to Compel Arbitration, or In the Alternative, Motion to Dismiss Plaintiffs' Claim (Motion) (Doc. 12), filed by Defendant Rabren General Contractors, Inc.[1] (Rabren) and the Objection and Motion to Strike Defendants' Evidence (Objection) (Doc. 20), filed by Baker Construction Services, LLC (Baker).  The Motion seeks enforcement of an arbitration clause

---

[1] Rabren General Contractors, L.P. and Rabren General Contractors, L.P. of Auburn formerly were plaintiffs in this action but were voluntarily dismissed.

contained in an unexecuted written subcontract drafted by Rabren in the course of the parties' negotiations over one specific project (Subcontract). Despite the subcontract's clear language stating that it is not valid unless initialed, Rabren demands arbitration of Baker's claims on the basis of the latter's manifestation of its assent to the Subcontract through its subsequent actions. Rabren also contends, in the alternative, that the Complaint should be dismissed for failure to state a claim.

Having reviewed the parties' briefs and evidentiary submissions on this matter and having conducted oral argument, the Court denies the Motion in full. Because the affidavit made the basis of Baker's Objection has not affected this decision, the Court further denies the Motion to Strike as moot.

## II.   <u>General Facts and Background</u>

Baker is a concrete contractor that has worked with Rabren, a general contractor and Alabama corporation, on several projects dating back to 2000. (Doc. 18-1.) In 2015, at least according to Baker, Baker and Rabren reached an understanding and agreement in which Rabren would hire Baker to perform all of Rabren's concrete work in Alabama in exchange for Baker's agreement not to bid against Rabren on any projects. (Doc. 1 at 2, 6.) Over the years, the parties' dealings on specific projects largely had taken the form of handshake arrangements. (Doc. 18-1.) For the most part, purchase orders and email communications usually evidenced their relationship and accord. (*Id.*)

2

On September 16, 2015, Rabren entered into a Prime Contract with Auburn City Schools for the construction of a new high school in Auburn, Alabama (the Auburn project). (Doc. 13-1 at 3.)  Consistent with the parties' past practice, emails and discussions between Rabren and Baker followed.  (*Id.*)  Ultimately, sometime in September 2015, Rabren hired Baker to perform all concrete work on this site for $952,157.00.  (*Id.*)

Thereafter, Rabren sent Baker a 44-page Subcontract for Baker to execute in connection with the Auburn project.  (*Id.* at 3-4.)   Two men from Rabren—Jon Rabren, its Vice President, and Bruce Ward (Ward), its Senior Project Manager— reviewed and approved the operative text.  (*Id.* at 3.)

The Subcontract identified Rabren as the General Contractor and Baker as the Subcontractor.   (Doc. 13-3 at 17.)   Crucially here, it contained an arbitration agreement requiring arbitration of "all claims of the Subcontractor" under the construction industry rules of the American Arbitration Association.  (*Id.* at 15.)  The Subcontract included signature lines for both Rabren and Baker. (*Id.* at 17.)  In bold type at the top of each page, the following statement appeared:

> FOR THE SUBCONTRACT TO BE VALID, YOU MUST INITIAL
> EVERY PAGE;  INITIALS _____

(*Id.* at 4-46.)

On October 7, 2015, Ward mailed two copies to Baker's last known physical mailing address.  (Doc. 13-2 at 2.)  The cover letter's second sentence reads: "<u>Please</u>

<u>initial the front of all pages</u>, sign, and return both copies to 306 Persimmon Drive, Auburn, AL 36830." (*Id.* (emphasis in original).) On November 24, 2015, another copy was sent to Charles Baker, not Baker Construction, via an email address previously used by one of his predecessor companies. (*See* Doc. 13-1 at 3; *see also* Doc. 13-3 at 2.) Ward sent a follow-up email on December 14, 2015. (Doc. 13-1 at 3-4; *see also* Doc. 13-4.) That missive specifically asked Charles Baker whether he would "be in town this week or next," as Ward would "like to sit down with . . . [him] and review scope and finalize [S]ubcontract." (Doc. 13-4 at 2.)

Yet, even while discussion over the terms apparently followed, the Subcontract was not initialed or signed by either party.

Instead, although neither party had done so, Rabren allowed Baker to proceed and perform the general work outlined in the Subcontract. (Doc. 19-3.) In addition to these broad responsibilities, Baker undertook certain other tasks contemplated under the Subcontract, such as the procurement of liability insurance and submission of pay applications. (Doc. 18-1 at 10, 14-15.) Furthermore, although the Subcontract required that any changes and modifications to the terms and conditions be reduced to writing and signed by the parties in order to be valid, no such change orders were ever executed despite the fact that changes were made during Baker's performance on the Auburn project. (Docs. 13-3 at 17; 13-8 at 1-5; 18-1 at 13.)

In August 2016, Baker left the Auburn project. (Doc. 13 at 9.) According to

4

Charles Baker, he did so because of nonpayment by Rabren, alleged racial and ethnic hostilities by Rabren employees toward himself and other Baker employees, and Rabren's purported failure to prepare the site for Baker's work. (*Id*.)  Rabren, however, claims that Charles Baker and his company simply abandoned their responsibilities as a result of performance issues and nonpayment. (Doc. 13-1 at 5.) At the time of this departure, Rabren had paid $508,670.44 despite being fully aware that neither party had signed or initialed the Subcontract. (*Id.*)

After leaving the Auburn project, Baker submitted a claim to Rabren's surety. (Docs. 13-12; 13-13; 18-1 at 16.)  As part of its investigation process, the surety requested a copy of Baker's supporting documents. (Doc. 18-1 at 16.) Among the documents submitted by Baker in response was the unexecuted Subcontract. (*Id.*)

## III.  <u>Relevant Legal Principles</u>

Passed in 1925, and presently codified in title 9 of the United States Code, the Federal Arbitration Act was designed to facilitate the enforcement of arbitration agreements.  9 U.S.C. § 2; S. Rep. No. 68-536, at 3 (1924); H.R. Rep. No. 68-96, at 1–2 (1924); *Kulukundis Shipping Co., S/A v. Amtorg Trading Corp.*, 126 F.2d 978, 983 (2d Cir. 1942).  Over time, the FAA has come to be seen as embodying "a liberal federal policy favoring arbitration," and its second section (Section 2) always has been regarded as its "primary substantive provision."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Per this section's first sentence,

widely known as the FAA's "Command Clause," the FAA preempts any contrary state law in cases involving interstate contracts or maritime transactions. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985). "Under the FAA, parties cannot be forced to submit to arbitration if they have not agreed to do so." *Chambers v. Groome Transp. of Ala.*, 41 F. Supp. 3d 1327, 1339 (M.D. Ala. 2014) (quoting *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992)). A court must itself determine whether an agreement to arbitrate unless the parties have expressly agreed to leave such decision to an arbitrator. *See id.* at 1335-36 (discussing *First Options of Chicago., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995)).

As the Eleventh Circuit has said, "a party seeking to avoid arbitration must [first] unequivocally deny that an agreement to arbitrate was reached and must offer some evidence to substantiate the denial." *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008) (internal citations omitted).[2] To do so, the resistant party must "'substantiate[] the denial of the contract with enough evidence to make the denial colorable.'" *Id.* Once—and only once—an agreement to arbitrate has been put "in issue," the FAA requires the district court to "proceed summarily to the trial thereof" and, if the objecting party has not requested a jury trial, "hear and determine such issue." *Id.* (internal citations omitted).

---

[2] Although unpublished opinions, generally denominated by a cite to the Federal Appendix or some electronic medium, "are not considered binding precedent . . . , they may be cited as persuasive authority." 11th Cir. R. 36-2. The Court treats them as such here and elsewhere.

The test to determine arbitrability and the allocation of the parties' burdens is clear:

> Section 2 requires a two-pronged inquiry: first, whether there is an arbitration agreement in writing; and second, if so, whether the agreement is part of a transaction involving interstate commerce. [The party seeking to compel arbitration] bears the burden of proving both prongs. These prongs also are not resolved with the "thumb on the scale in favor of arbitration because the federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties.

*Chambers*, 41 F. Supp. 3d at 1338 (internal citations omitted).

Usually, courts must look to state law principles of contract formation to determine whether an agreement to arbitrate exists. *See First Options,* 514 U.S. at 944; *Chambers*, 41 F. Supp. 3d at 1342.

In addition, the Eleventh Circuit has countenanced the use of the summary judgment-like standard to resolve a motion to compel arbitration. *See In re Checking Account Overdraft Litig.,* 754 F.3d 1290, 1294 (11th Cir. 2014) (describing an order compelling arbitration as "summary-judgment-like" and "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate").

## IV. <u>Discussion</u>

### A.   **Rabren's Arbitration Motion**

The primary issue before the Court is Rabren's insistence that Baker must resort to arbitration pursuant to the relevant provision of the unsigned and uninitialed

Subcontract.

The parties, naturally, provide sharply divergent arguments as to this issue. According to Rabren, the parties discussed the Subcontract in general and its terms and conditions in particular, and Baker manifested its intent to be bound by the Subcontract during these consultations and by its subsequent actions.  (Doc. 13-1.) Baker disputes Rabren's assertions, submitting affidavit testimony from Charles Baker unequivocally stating that he "never saw, signed or agreed to the alleged contract" (Doc. 18-1 at 17), "never discussed the alleged subcontract with any of the Defendants," (Doc. 18-1 at 2), and "did not agree to or act under the alleged subcontract" (Doc. 18-1 at 16).

*But for* the undisputed fact that the Subcontract was never signed and initialed by the parties to this case, including Rabren, the Motion would be a quick one for the Court to resolve favorably to Rabren.

However, as in life, rarely do things come easy.  In as much as Rabren argues that Baker's actions subsequent to Rabren's submission of the Subcontract constitute evidence of Baker's manifestation of the Subcontract's acceptance, Rabren's decision to allow Baker to begin and continue its work on the Auburn project in the absence of an executed Subcontract equally supports the conclusion that Rabren did not intend the parties to be bound by it.  As such, that Baker performed concrete work at the Auburn project after the Subcontract was sent to Baker constitutes little

evidence that either party intended to be bound by it.  The evidence, in other words, cuts for and against both parties, far less than necessary to support any definitive determination as to the parties' original intent and thus an order compelling arbitration.

Regardless, Baker and Rabren present the Court with something else entirely: a completely unsigned Subcontract, one not even signed by the very party now demanding its enforcement during the entire time of the parties' association; general noncompliance by both parties with its terms and conditions; and contrasting testimony regarding each party's knowledge of and intent to be bound by the Subcontract.  Perhaps recognizing the difficultly presented by its failure to present a written signed Subcontract, Rabren resorts to inundating the Court with over 100 pages of affidavit testimony, emails, unsigned change orders, unsigned payment applications, and project drawings and specifications in an attempt to show that although Baker never signed the Subcontract, nevertheless Baker is bound by it through its actions.  (Docs. 13; 14.)  Baker is no less guilty, for it too has flooded the Court with over 100 pages of affidavit testimony and emails in an attempt to prove the opposite. (Docs. 17; 18-1; 18-2; and 19.)  While the parties' document dump may occasionally lead to the inescapable conclusion that there is a genuine issue of material fact on the issue of mutual assent, this is not so here.

Well-established law explains why this is so.  Both the Supreme Court and the Eleventh Circuit have held that because arbitration is a matter of contract, determining the validity of an arbitration agreement "is generally a matter of state law." *Entrekin v. Internal Med. Assocs. of Dothan, P.A*., 689 F.3d 1248, 1251 (11th Cir. 2012) (quoting *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp*., 559 U.S. 662, 681 (2010)); *see also Caley v. Gulfstream Aero. Corp*., 428 F.3d 1359, 1368 (11th Cir. 2005) ("[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts.").  This law compels all courts to "apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944.  And, of course, "[t]he highest court of each State . . . remains the final arbiter of what is state law." *Montana v. Wyoming*, 563 U.S. 368, 377 n.5 (2011).

Under Alabama law, "[t]he requisite elements of [a contract] include: an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract." *Lyles v. Pioneer Housing Sys., Inc.*, 858 So. 2d 226, 229 (Ala. 2003) (quoting *Ex parte Cain*, 838 So. 2d 1010, 1027-28 (Ala. 2002)).  Not only must assent "be manifested by *something*," *S. Energy Homes, Inc. v. Hennis*, 776 So. 2d 105, 108 (Ala. 2000), but "one who asserts that she is not a party to a contract in order to avoid arbitration 'disclaims any basis for recovery on her claims' under the contract," *Lyles*, 858 So. 2d at 229 (citing *Ex parte Warren*, 718 So. 2d 45,

47-48 (Ala. 1998) (plurality opinion)).   Accordingly, the issue before the Court is whether, under the particular facts in this case, the signatures and initials of both parties are required in order to demonstrate, under a summary judgment-like standard, the existence of mutual assent to the formation of the arbitration agreement in the Subcontract.

Alabama law provides "[t]he purpose of a signature on a contract is to show mutual assent." *Ex parte Rush*, 730 So. 2d 1175, 1177-78 (Ala. 1999) (citing *Ex parte Holland Mfg*, 689 So. 2d 65 (Ala. 1996)).   But the Eleventh Circuit has noted that, "while the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties." *Caley*, 428 F.3d at 1368.   Alabama's state appellate courts have said the same. *See, e.g*., *Bowen v. Sec. Pest Control, Inc*., 879 So. 2d 1139 (Ala. 2003); *Rush*, 730 So. 2d at 1175.

It is that general proposition that Rabren advances in arguing that no signatures are needed on the Subcontract when the parties' own actions manifest their intent to be bound by the terms and conditions of the contract. (Doc. 13 at 13-19.)   And Rabren is correct that there are a multitude of case decisions where Alabama courts, state and federal, have compelled arbitration under a contract or document that is void of signatures.

However, Rabren ignores the recognized exceptions to the rule regarding the ability to enforce an arbitration provision in the absence of a signed contract or document. As the Supreme Court of Alabama has held,

> Unless a contract is required by a statute to be signed (the FAA contains no such requirement), or by the Statute of Frauds to be in writing (the contract here is not subject to Alabama's Statute of Frauds, Ala. Code 1975, § 8-9-2, which requires the signature of the party against whom enforcement is sought), *or unless the parties agree that a contract is not binding until it is signed by both of them* ..., it need not be signed by the party against whom enforcement is sought, provided it is accepted and acted upon.

*Rush*, 730 So. 2d at 1178 (emphasis added). It is the third referenced exception that this Court ordered the parties to address in supplemental briefing after conducting oral argument on the Motion and Motion to Strike.  (Doc. 34.)

In the present case, the Subcontract that Rabren seeks to invoke is, if nothing else, unambiguous in one crucial respect: in clear and unmistakable terms it provides that it is not valid unless each page is initialed by the parties.  (*See* Doc. 13-3 at 3-46.).  Even the first email from Rabren confirms a necessary signature requirement, as it says so in its very second clause—and in bold underline.  (*See* Doc. 13-2 at 2.) As written and conveyed, the Subcontract itself thus explicitly limits how the parties can manifest their intent and, here, that can only be through initialing the Subcontract.  (*See* Doc. 13-3 at 3-46.)   From the very beginning, the Subcontract thus predicated its enforceability on the parties' compliance with several explicit

requirements.  Whatever the parties did thereafter cannot change this essential fact: its existence—which included that fateful arbitration clause—depended upon compliance with its conditions, regardless of the parties' thought then and afterward.[3]

While parties can manifest their intent to be bound by a contract through their subsequent actions, thereby ratifying it, *e.g.*, *Hennis*, 776 So. 2d at 108, similar express limitations on how the parties can manifest assent have prompted a number of federal and state courts to refuse to enforce arbitration agreements in contracts that require the parties to sign them.  *See, e.g.*, *Stover v. Valley Rubber LLC*, No. 5:18-cv-1795-LCB, 2019 WL 4538682, at *3 (N.D. Ala. Sept. 19, 2019); *Med Ctr. Cars, Inc. v. Smith*, 727 So. 2d 9, 14-15 (Ala. 1998) (concluding that arbitration agreement contained in a buyer's order that contained language stating that it was not valid unless accepted by the seller was not enforceable because the defendant seller failed to sign the buyer's order); *Blue Cross & Blue Shield of Ala. v. Woodruff*, 803 So. 2d 519, 526 (Ala. 2001) (refusing to enforce arbitration agreement contained in insurance policy amendment that was not properly amended under policy language due to absence of a signature*); Premiere Chevrolet, Inc. v. Headrick*, 748 So. 2d 891, 892-93 (Ala. 1999) (relying on and reaching the same conclusion as

---

[3] In such cases, relief can be sought, but not based on the contract.  Instead, either party would be forced to resort to quasi-contract or tort theories.

*Medical Centers Cars, Inc. v. Smith*, 727 So. 2d at 14).  Ratification of a contract can, in fact, take place via action even as to an unsigned document, but only when the contract plainly classifies such conduct as having that effect.  *Cf. Baptist Health Sys. v. Mack*, 860 So. 2d 1265, 1273-74 (Ala. 2003) (explaining what kind of post-receipt conduct can amount to true ratification and ultimately enforcing an arbitration agreement between an employee and employer where the terms of the arbitration agreement specifically indicated that an employee's continued employment would indicate acceptance of the agreement); *Young v. Turner Specialty Servs., LLC*, No. 7:18-cv -02083-LSC, 2019 WL 2869676, 2019 U.S. Dist. LEXIS 111298 (N.D. Ala. July 3, 2019) (canvassing relevant case law).  Otherwise, only a signature will work to render enforceable a contract onto which such a prerequisite has been crafted.  *See Power Equip. Co. v. First Ala. Bank*, 585 So. 2d 1291, 1296 (Ala. 1991) ("When a competent adult, having the ability to read and understand an instrument, signs a contract, he will be held to be on notice of all the provisions contained in that contract and will be bound thereby.").

For example, in *Stover*, the United States District Court for the Northern District of Alabama, in applying Alabama law, refused to enforce an arbitration agreement that was contained in an employee handbook.  It did so because the written handbook acknowledgement expressly required that it be signed by the general manager to constitute a binding contract.  2019 WL 4538682, at *3.

14

Discussing the exceptions outlined in *Ex parte Rush*, the *Stover* court noted "there is evidence that the parties agreed that the contract to arbitrate was not binding unless it was signed by both parties." *Id.* In such a situation, only nonenforcement could follow because, after all, it could find no express, unequivocal agreement to that effect.

Indeed, the principle regarding application of the contract language equally has been applied when nonparties attempt to compel arbitration based on a written arbitration provision whose express language limits its application to the signatory parties, even when the nonsignatory may have otherwise attempted to manifest its assent through its actions, such as acting in conformity with the agreement. *See, e.g., Nissan N. Am., Inc. v. Scott*, 246 So. 3d 90, 93-94 (Ala. 2017) (refusing to compel arbitration against a nonsignatory based on the express language of the arbitration agreement that limited its application to only the signing parties); *Ex parte Stamey*, 776 So. 2d 85, 89 (Ala. 2000) (stating that where "the language of the arbitration provisions limited arbitration to the signing parties", the court has not allowed the claims against the nonsignatories to be arbitrated).

That the parties each may have acted in conformity with some of the provisions of the Subcontract is largely without consequence, especially under the facts here, where it appears that both parties (including Rabren) failed to strictly comply with all of the terms of the Subcontract. In other words, partial compliance

does not rise to the level of proving manifestation of assent from a "summary-judgment-like" standpoint, especially in the presence of contested evidence that Baker actually was aware of the Subcontract when it performed the concrete work at the Auburn project.[4]

Rabren's additional points are just as unavailing. It first points to Baker's affirmative action in submitting a copy of the unexecuted Subcontract to Rabren's bonding company as part of Baker's bond claim (Doc. 13) as evidence that Baker agreed to and acknowledged the terms of the Subcontract. But the legal ramification is a nonissue because, again, the Subcontract requires it to be signed and initialed to be valid.

Rabren next presents evidence of discussions that it purportedly had with Baker about the Subcontract and other communications (primarily emails) and documents, such as unsigned change orders and unsigned and unnotarized pay applications[5] that reference a subcontract number and project price that are

---

[4]   A review of the Complaint reveals that Baker does not sue Rabren on the Subcontract, nor does it appear that Baker must sue Rabren on the Subcontract in order to successfully pursue a nonpayment claim. *See, e.g., Dannelly Enters. v. Palm Beach Grading, Inc*., 200 So. 2d 1157 (Ala. 2016). At oral argument, Baker stipulated that it is not suing Rabren for breach of the Subcontract and is not basing, and will not base in the future, its claims on the Subcontract. Having stipulated that it is not and will not sue on the Subcontract or base its claim on the Subcontract and with the Court having relied upon that representation as part of the basis for denying Rabren's arbitration motion, Baker cannot later shift gears and invoke the Subcontract in this litigation in support of any claim for relief or damages. "Having saddled up to that horse, [Baker] must continue riding it." *Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F.3d 814, 816 (11th Cir. 2001).

[5] Baker has submitted pay applications of its own that do not reference a subcontract number, but instead reference a "PO."

consistent with those referenced in the Subcontract.  But again, these documents do not alter the language of the Subcontract that requires it to be initiated on every page to be valid.  Moreover, none of the documents submitted by Rabren reflect an unequivocal acknowledgment that Baker was agreeing to be bound by the Subcontract's every term and condition, nor do they contain language that expressly incorporated the Subcontract and all of its terms by reference.  *See, e.g., Dannelly Enters. v. Palm Beach Grading, Inc.*, 200 So. 2d 1157 (Ala. 2016) (concluding that contractor could not compel arbitration of claims against subcontractor where record evidence only showed that the parties were operating under a work order submitted by the subcontractor).  Indeed, not only did Rabren not require Baker to sign the Subcontract prior to performance, but it also has presented written change orders and pay applications[6] that were not signed by Baker either.  (Docs. 13-8 at 2-5; 13-9 at 2-5.)   Under the Subcontract, even these written change orders had to be signed in order to be valid.  Yet, again, Rabren required no such signatures, in effect ignoring its own contract's specifications.

---

[6] The pay applications do not contain language stating that the signatory subcontractor was agreeing to the terms and conditions of the Subcontract, and they do not expressly incorporate the Subcontract by reference.  The pay applications do refer to the "Contract Documents" but they do not define or explain what those contract documents consist of.  Thus, even if the pay applications had been signed and notarized by Baker, it is doubtful they would constitute sufficient summary-judgment-like evidence of Baker's assent to the Subcontract to warrant enforcement of the arbitration agreement.

In short, the Subcontract clearly contemplates that both parties had to sign and initial the Subcontract in order for it to be valid and binding.  Here, not only was the Subcontract not signed by Baker (against whom Rabren is trying to enforce it), but it is also not signed by Rabren.   When considered in the light most favorable to the nonmoving party, given Baker's unequivocal denial of an agreement to arbitrate under the summary-judgment-like standard that this Court must follow, Rabren has not met its burden under the FAA.  Therefore, Rabren's arbitration motion must be denied.

**B.      The Motion to Dismiss**

In the alternative, Rabren argues that Baker's claims should be dismissed for failure to state a claim.  The Court will address each of Baker's claims in turn.

**1.  The Breach of Contract Claim**

Count I is a claim for Breach of Contract founded upon two alleged contracts between Baker and Rabren.

The first is a purported "exclusive provider contract" between the parties for Baker to perform all of the concrete work for Rabren's projects in Alabama in exchange for Baker's agreement not to bid against Rabren for projects involving concrete work in Alabama. (Doc. 1 at 2, 6.)   Baker maintains that Rabren breached this agreement when Rabren hired other companies to perform concrete work for Rabren. (*Id.* at 6.)

The other claim is more specific, as it actually concerns the Auburn project. In particular, Baker claims that it had an agreement with Rabren to pour concrete for the stairwells and archways at Auburn High School but that Rabren breached this pact by not adequately and properly preparing the site for Baker's work and not fully paying Baker for the work that it actually performed.  (Doc. 1 at 3.)

In the Motion, Rabren moves to dismiss the "exclusive provider contract" claim, arguing that it is barred by the Statute of Frauds.  (Doc. 13 at 24.)  Rabren does not move to dismiss the contract claim specific to the Auburn project on this basis.[7]  Accordingly, the Court will only address the "exclusive provider contract", which Rabren characterizes as the "universal contract" claim.

In its simplest, Rabren argues that the exclusive provider contract claim "consists of an oral agreement contemplating performance for a period longer than one year" and therefore it violates Alabama Code (1975) § 8-9-2.  (Doc. 13 at 24.) Conversely, Baker contends the Statute of Frauds does not apply because the referenced projects could be completed within one year and the statute only applies to executory contracts.  (*See* Doc. 18 at 24-26.)

---

[7] Rabren also raises a *Twombly/Iqbal* argument in response to the breach of contract claim.  This Court, however, believes Baker has sufficiently pleaded this claim in its Complaint at this point. However, this does not mean that this claim will survive a summary judgment motion directed to the underlying facts surrounding this claim.

As it concerns the Statute of Frauds, it very well may be that it bars the contract claim, but it is too early in this case for the Court to make a dispositive ruling regarding the statute's application.  The Statute of Frauds is an affirmative defense that can only be considered at this stage if it is apparent on the face of the Complaint that it applies. *See Hudson Drydocks, Inc. v. Wyatt Yachts, Inc*., 760 F.2d 1144, 1146 n.3 (11th Cir. 1985).  At this point, the Court cannot conclude that dismissal of this claim based on the Statute of Frauds inexorably follows based on the face of the Complaint.  Accordingly, the Court will deny the Motion to the extent it seeks dismissal of Count I, but will be ready to address it once the parties adduce additional relevant facts at or before this matter's summary judgment deadline.

### 2.  Hostile Work Environment

Count II of the Complaint alleges that Baker was subject to a racially and ethnically hostile work environment from Rabren in violation of 42 U.S.C. § 1981. In particular, its performance and payment, Baker insists, was negatively impacted because of the racial and ethnic animosity exhibited by Rabren employees at the jobsite.  (Doc. 1 at 7-8.)

Rabren targets this claim for dismissal.  It first argues that this kind of claim requires the existence of an underlying contract, and since there is no underlying contract due to the Statute of Frauds, there can be no Section 1981 claim.  (Doc. 13 at 26.)  In addition, Rabren argues that Baker, as an artificial entity, cannot assert a

hostile work environment claim as a matter of law.  (*Id.* at 27.)

The Court finds both of these attacks to be premature at this stage.  First, to the extent Rabren challenges this claim based upon the Statute of Frauds, the Court already has concluded so.  As to whether a Section 1981 hostile work environment claim can be asserted by an artificial entity as a matter of law, the same conclusion follows.  In the Court's view, at this stage, the parties simply have not provided sufficient facts and legal argument to rule regarding the validity of such a claim, especially since the legitimacy of this claim could turn on factual issues such as the type of artificial entity at issue[8], the number of and race and ethnicity of each of its members, owners and employees, the nature of the hostile environment in terms of who said what, when and to whom, and the impacts and damages specific to the entity.  The Court thus will revisit Rabren's argument at the summary judgment stage with the hope that the parties have further developed the factual and legal basis for this argument, particularly whether it holds any water within the Eleventh Circuit.

## V.    <u>Conclusion</u>

For the foregoing reasons, it is hereby ORDERED that Defendant Rabren General Contractors, Inc.'s Motion to Compel Arbitration, Or in the Alternative,

---

[8] The Court foresees a distinction that could be drawn based on the type of artificial entity involved. For example, a closely-held single-member limited liability company may have a more racial and ethnic identity compared to a multi-shareholder C-corp. that is largely disconnected from the identities of its thousands of shareholders and employees.

Motion to Dismiss Plaintiffs' Claims (Doc. 12) is due to be and is hereby DENIED.

It is further ORDERED that Baker Constructions Services LLC's Objection and

Motion to Strike Defendants' Evidence (Doc. 20) and Motion for Leave to File

Reply (Doc. 39) are DENIED as moot.

    DONE, this 5th day of May, 2020.


                        /s/ R. Austin Huffaker, Jr.
                    R. AUSTIN HUFFAKER, JR.
                    UNITED STATES DISTRICT JUDGE